RECEIVED
Jun 03, 2026
DEPARTMENT OF
WATER RESOURCES

Tanner F. Crowther, ISB# 8715
Chief Counsel
Office of the Chief Counsel
U.S. Department of Energy – Idaho Operations Office
1955 Fremont Ave.
Idaho Falls, ID 83402
Mailstop 1209
Telephone: (208) 360-3478
Email: crowthtf@id.doe.gov

Attorney for U.S. Department of Energy

**BEFORE THE DEPARTMENT OF WATER RESOURCES**

**OF THE STATE OF IDAHO**

| | |
|---|---|
| IN THE MATTER OF DISTRIBUTION OF WATER TO VARIOUS WATER RIGHTS HELD BY OR FOR THE BENEFIT OF A&B IRRIGATION DISTRICT, AMERICAN FALLS RESERVOIR<br><br>DISTRICT #2, BURLEY IRRIGATION DISTRICT, MILNER IRRIGATION DISTRICT, NORTH SIDE CANAL COMPANY, AND TWIN FALLS CANAL COMPANY | Docket No. CM-DC-2010-001<br><br>**U.S. DEPARTMENT OF ENERGY AMENDED PETITION FOR RECONSIDERATION AND REQUEST FOR HEARING** |

**UNITED STATES DEPARTMENT OF ENERGY'S SPECIAL APPEARANCE AND OPPOSITION TO THE IDAHO DEPARTMENT OF WATER RESOURCES FINAL ORDER CURTAILING GROUND WATER RIGHTS JUNIOR TO OCTOBER 11, 1900, DATED MAY 14, 2026.**

The United States Department of Energy (hereinafter "DOE"), by and through counsel, hereby makes this special appearance for the limited purpose of contesting IDWR's ability to exercise jurisdiction over DOE and seeking reconsideration pursuant to Idaho Code § 67-5246(4) and rule 740.02.b of the Department's rules of procedure in response to the Director's *Final Order Curtailing Ground Water Rights Junior to October 11, 1900,* dated May 14, 2026. This

petition requests that the Director withdraw those parts of the Final Order that seek to curtail DOE's federally reserved Water Right No. 34-10901. If the Director declines to amend the Final Order as requested, then DOE requests a hearing pursuant to Idaho Code § 67-5242 and/or § 42-1701A(3) and rule 740.02.c of the Department's rules of procedure.

## ARGUMENT

### I. IDWR Has No Authority to Curtail DOE's Adjudicated Water Rights.

The 1990 *Water Rights Agreement Between the State of Idaho and the United States, for the United States Department of Energ*y (hereinafter the "DOE Agreement," attached hereto as Exhibit 1) is binding upon the State of Idaho and conclusive as to the nature and extent of Water Right No. 34-10901 held by DOE in the State of Idaho. The Agreement does not confer upon the Idaho Department of Water Resources (IDWR) any right to curtail or otherwise administer DOE's adjudicated water rights.

Under the McCarran Amendment, when properly joined as a party to a suit for the adjudication or administration of water rights, the United States is "subject to the judgments, orders, and decrees of the *court* having jurisdiction." 43 U.S.C. § 666 (emphasis added). In 1985, the Idaho legislature enacted Idaho Code § 42-1406A(1), which read, in part:

> Effective management in the public interest of the waters of the Snake River basin requires that a comprehensive determination of the nature, extent and priority of the rights of all users of surface and ground water from that system be determined. Therefore, the director of the department of water resources shall petition the district court to commence an adjudication within the terms of the McCarran amendment, 43 U.S.C. section 666, of the water rights of the Snake River basin either through initiation of a new proceeding or the enlargement of an ongoing adjudication proceeding.

Idaho Code § 42-1406A(1) (uncodified and amended by S.L. 1994, ch. 454, § 11, effective April 12, 1994.)

In 1986, Idaho's adjudication statutes were amended "to provide a statutory procedure for incorporating a negotiated agreement between a federal reserved water right claimant and the State of Idaho into an adjudication . . ." Ann Y. Vonde *et al.*, *Understanding The Snake River Basin Adjudication*, 52 IDAHO L. REV. 53, 59 (2016). Consistent with this authority, in 1990 DOE and the state entered into the DOE Agreement, which quantified "all existing water rights and claims to water rights of the United States under state and federal law for the use by the Department of Energy in the Snake River Basin in the State . . ." DOE Agreement at 5. Under that Agreement, DOE is entitled to use up to 35,000 acre-feet of water per calendar year and a maximum diversion rate not to exceed 80 cubic feet per second. The terms of that agreement were fully incorporated in the district court's Final Unified Decree, dated August 25, 2014, which is "conclusive as to the nature and extent of all rights of the United States to the use of the waters of the Snake River Basin water system within the State of Idaho with a priority date before November 19, 1987." *Final Unified Decree, In re SRBA, Case No. 39576* (5th Jud. Dist. Idaho Aug. 25, 2014), at 7. (Exhibit 2). IDWR has no authority to unilaterally interfere with DOE's properly adjudicated right.

While IDWR possesses general authority under Idaho law to administer adjudicated water rights within the Snake River Basin in accordance with the prior appropriation doctrine (*see* Idaho Code § 42-237a(g)), this general authority does not extend to DOE's adjudicated water rights because (i) IDWR's administrative process falls outside the limited waiver of sovereign immunity granted by the McCarran Amendment; and (ii) the United States did not consent to routine state curtailment or administration of its quantified rights.

***i.*** ***IDWR's administrative process falls outside the limited waiver of sovereign immunity granted by the McCarran Amendment.***

Through the McCarran Amendment, the United States consented only to "join the United States as a defendant in any suit … (2) for the administration of such rights." 43 U.S.C. § 666. "Any waiver of sovereign immunity is to be strictly construed in favor of the sovereign and must be expressed unequivocally." *Nielson v. United States, Bureau of Land Mgmt.*, 247 F. Supp. 3d 1152, 1158 (D. Idaho 2017).

The United States' consent to be sued under the McCarran Amendment applies only to "suits," a term that the Ninth Circuit indicated refers "not only traditional suits in equity but also hybrid adjudications[1] taking advantage of the expertise of nonjudicial officials." *United States v. Oregon, Water Resources Dep't*, 44 F.3d 758, 766 (9th Cir. 1994). However, IDWR's Order is not a "hybrid adjudication" as contemplated by the Ninth Circuit. Instead, it is a purely administrative action with no seamless or automatic integration with the court. Instead, it parallels a structure that the First Circuit found non-compliant with the McCarran Amendment in *United States v. Puerto Rico*. As the First Circuit explained:

> The statutory scheme considered in *Oregon* was a unitary scheme that contained two interconnecting tracks. Although it envisioned that an action would be commenced administratively by the agency . . .that action automatically would proceed to a judicial forum upon completion of the administrative process. In other words, the Oregon statute constructs a seamless proceeding, possessing both administrative and judicial components. These two components "are not independent or unrelated, but parts of a single statutory proceeding, the earlier stages of which are before the [agency] and the later stages before the court." *Pacific Live Stock Co. v. Or. Water Bd.*, 241 U.S. 440, 451, 60 L. Ed. 1084, 36 S. Ct. 637 (1915) (commenting upon Oregon's statutory scheme for the administration of water rights). In other words, the agency "merely paves the way for an adjudication by the court of all the rights involved." *Id.*

*United States v. Puerto Rico*, 287 F.3d 212, 219 (1st Cir. 2002) (emphasis added).

[1] References to adjudication cases are cited herein due to the lack of caselaw directly addressing administration of federal reserved water rights under the McCarran Amendment; however, the McCarran Amendment uses the same language concerning suits for adjudication and administration, indicating that the same principles can apply to administration matters.

The administrative process initiated by IDWR's delivery call and curtailment order under Idaho Code Title 42, Chapter 2 stands in stark contrast to the "seamless proceeding" described in *Oregon*. Like the Puerto Rican system, Idaho's administrative framework does not automatically flow into a judicial forum. The Director's Order is final agency action. It does not "pave the way for an adjudication by the court;" it is the administrative end of the road.

The only path to a court is for an aggrieved party to initiate an entirely separate action by filing a petition for judicial review under the Idaho Administrative Procedure Act (IDAPA). *See* I.C. §§ 42-1701A(4), 67-5270. This is the opposite of a unitary scheme. Moreover, the court's role in an IDAPA review is not to conduct a new trial or act as the primary adjudicator. Instead, its review is limited and deferential, confined to the agency record and focused on whether the agency's action was lawful and supported by substantial evidence. *See* I.C. § 67-5279. This is precisely the type of separate, non-integrated judicial oversight that the First Circuit found insufficient to qualify as a "suit" as the term is used in 43 U.S.C. § 666.

Because the delivery call process is purely administrative and not an integrated "suit," the McCarran Amendment's waiver of sovereign immunity does not apply. IDWR cannot compel the United States to participate in this non-judicial administrative framework to defend a right that has already been decreed in a proper McCarran suit—the Snake River Basin Adjudication.

***ii.*** ***<u>The United States did not consent to routine state curtailment or administration of its quantified rights—nor did the Court's Final Decree subject DOE to such actions.</u>***

Article 6.1 of the DOE Agreement states:

> The parties are unable to agree upon whether the issue of administration is ripe or otherwise appropriate for decision in the SRBA, and if so, whether and to what extent the Director has authority to administer federal water rights. Accordingly, this Agreement does not address this issue except as expressly provided in article 6.2. Each party reserves the right to litigate the issue of administration, if and when the need arises.

DOE Agreement, art. 6.1.[2]

The Agreement further states: "Nothing in this Agreement shall be construed or interpreted: To limit the authority of the United States to manage its lands or water rights in accordance with the Constitution, statutes, regulations, and procedures of the United States." DOE Agreement, art. 9.7.7. Clearly, at the time the DOE Agreement was executed, the United States did not agree or consent to IDWR administering federal water rights. The Idaho Supreme Court has acknowledged federal rights to administration in other contexts. *See United States v. State*, 131 Idaho 468, 472, 959 P.2d 449, 453 (1998) ("We agree with the United States and the observation by the Colorado Supreme Court that the purpose of PWR 107 includes a federal reserved water right and that the United States *has the right to administer those water rights*." (emphasis added)).

The language of Article 6.1 demonstrates that the fundamental question of IDWR's authority to administer DOE's rights was never settled by the agreement. Because the parties could not agree, the issue was carved out from the settlement and was therefore never submitted to the SRBA court for adjudication. Consequently, IDWR cannot now act as if this authority was granted or decreed. By issuing a curtailment order, IDWR is attempting to unilaterally exercise a power that the United States explicitly refused to concede, and that the district court's Final Unified Decree never granted. The purpose of reserving the right to "litigate . . . if and when the need arises" was not to green-light future unilateral administrative action, but to require that the

[2] Article 6.2.2 of the DOE Agreement states that DOE "*voluntarily* agrees to provide the State with a comprehensive inventory of all wells . . . at or relating to activities at the INEL." DOE Agreement, art. 6.2.2 (emphasis added).

assertion of such authority be tested first in a proper judicial forum where the United States' sovereign immunity could be properly addressed.

DOE does not dispute that the United States was properly joined as a party to the SRBA action. Nor does DOE dispute the validity of the Final Unified Decree or the 1990 DOE Agreement. But nothing in those sources permits IDWR to curtail DOE's properly adjudicated rights or otherwise grants IDWR authority to administer DOE's adjudicated water rights. Likewise, nothing in the McCarran Amendment subjects the United States to such unilateral interference by a state agency. As stated by the Idaho Supreme Court quoting Senator McCarran: "the McCarran Amendment is 'not intended to be used for any other purpose than to allow the United States to be joined in a suit wherein it is necessary to adjudicate all of the rights of various owners on a given stream.'" *In re Snake River Basin Water Sys.*, 115 Idaho 1, 7 (1988). Moreover, even where the McCarran Amendment allows the federal government to be joined as a defendant in a suit, the Supremacy Clause of the United States Constitution still constrains the substantive application of state law where it would defeat the purpose of the federal reservation. *See Avondale Irrigation Dist. v. North Idaho Properties*, 99 Idaho 30, 40, *n15* (1978) ("[A]n Idaho statute may not be applied to a federal reserved water right if such application changes the nature and scope of that federal water right."); *see also In re General Adjudication of All Rights*, 195 Ariz. 411, 423 (1999) ("Holders of federal reserved rights enjoy greater protection from groundwater pumping than do holders of state law rights to the extent that greater protection may be necessary to maintain sufficient water to accomplish the purpose of a reservation.").

The district court's Final Unified Decree clarified that "in the case of any conflict between this Final Unified Decree and the partial consent decrees approving reserved water right settlements, the partial consent decrees approving the reserved water right settlements . . . shall

control." *Final Decree* at 10-11. Thus, for purposes of determining the parties' respective rights and obligations, the DOE Agreement is of paramount importance. While DOE is not aware of anything within the district court's Final Unified Decree purporting to grant IDWR the power to curtail or otherwise administer DOE's water right, any such language would yield to Article 6.1 of the DOE Agreement.

By explicitly leaving the issue of administration unresolved and preserving each party's right to litigate the Director's authority "if and when the need arises" (DOE Agreement, art. 6.1), the United States did not consent to routine state curtailment or administration of its quantified rights—nor did the Court's Final Decree subject DOE to such actions.

Accordingly, IDWR's ordinary post-adjudication administrative authority yields in this instance to the United States' sovereign immunity, as well as to the specific, bargained-for limitation contained in the DOE Agreement. IDWR appears to have previously recognized and applied these limitations, as reflected in its July 2025 curtailment orders, which curtailed groundwater rights junior to October 11, 1900, but did not include DOE's water right at the INL. *See Final Order Curtailing Ground Water Rights Junior to October 11, 1900* (July 25, 2025) (Exhibit 3). This final order was issued in accordance with the limitations bargained for in DOE's Agreement with the state as it curtailed water use junior to DOE's Water Right No. 34-10901 but did not assert curtailment authority over this right. In contrast, IDWR now asserts administrative authority over DOE's water rights in its May 14, 2026, curtailment order, without explanation for this departure from its prior approach or explanation as to why it drastically changed course.

The Director's *Final Order Curtailing Ground Water Rights Junior to October 11, 1900*, dated May 14, 2026, exceeds IDWR's authority as applied to DOE Water Right No. 34-10901

and is unenforceable against DOE. IDWR must amend the Final Order as requested by DOE to correct this error. DOE reserves its right to pursue all legal avenues to manage its water rights and seek legal relief from IDWR's unlawful order.

## II. IDWR's Attempt to Compel DOE to Participate in an Approved Mitigation Plan is Improper and Impractical.

IDWR's order states that curtailed users "may seek to participate in an approved mitigation plan through a ground water district." Order at 4. While use of the word "may" gives the illusion that this is simply an option to consider, this is a Hobson's choice for DOE: either participate in an approved mitigation plan or face immediate and unlawful curtailment of a federal reserved water right.

By conditioning the use of DOE's water right on participation in a third-party mitigation plan, IDWR is attempting to indirectly achieve what it cannot do directly: force a re-adjudication of priorities between the United States and private water users. This turns the McCarran Amendment on its head. The amendment allows the U.S. to be brought into a *comprehensive* public adjudication to settle all rights at once, or a suit for administration of such rights. This limited waiver of sovereign immunity was not perpetual consent to unilateral state administrative actions that seek to compel the United States to negotiate or settle with private parties outside of a comprehensive adjudicatory process. As the Ninth Circuit and Idaho Supreme Court have recognized:

> There can be little doubt as to the type of suit congress had in mind [when passing the McCarran Amendment]. It was not a private dispute between certain water users as to their conflicting rights to the use of waters of a stream system; rather, it was the quasi-public proceeding which in the law of western waters is known as a "general adjudication" of a stream system: one in which the rights of all claimants on a stream system, as between themselves, are ascertained and officially stated.

*Snake River Basin Water Sys*., 115 Idaho at 7-8 (quoting *State of California v. Rank*, 293 F.2d 340, 347 (9th Cir.1961)).

Despite the clear limits Congress placed on this waiver of sovereign immunity, IDWR seeks to compel DOE to the negotiating table with private parties simply to enjoy a water right that was already "ascertained and officially stated" in the SRBA. Such action finds no basis in the McCarran Amendment or the final SRBA decree as applied to DOE.

Moreover, even if IDWR had the authority to unilaterally administer DOE's water rights—which it doesn't—its proposed solution that DOE "seek to participate in an approved mitigation plan through a ground water district" presents several problems for DOE. As an agency of the federal government, DOE may face challenges agreeing to the terms and conditions of existing mitigation plans. Federal law prevents DOE from agreeing to terms that would violate the Anti-Deficiency Act, that would constitute a tax, or that lack language indicating that all commitments of funds are subject to appropriations from Congress. The difficulty of joining existing agreements places DOE at a disadvantage relative to other water users, including those with water rights that are junior to DOE's.

These difficulties are compounded by IDWR's own inconsistent actions. In its *Final Order Curtailing Ground Water Rights Junior to October 11, 1900*, dated July 25, 2025, IDWR correctly accounted for the unique status of DOE's water rights and did not include them on the curtailment list. (Exhibit 3). Having established this correct legal application, IDWR's unexplained reversal in its May 14, 2026, order places DOE at a significant procedural disadvantage with no reasonable amount of time to address the complex issues associated with joining a mitigation plan.

This is fundamentally unfair to DOE, which has already demonstrated extraordinary water use mitigation through its own actions, achieving a reduction of approximately 96% relative to its consumptive use allotment and made significant recent investments in water conservation infrastructure.

## III. DOE Has Significantly Mitigated its Water Use Relative to its Federal Reserved Water Right Allocation.

Even if DOE's water rights were subject to IDWR administration, DOE has sufficiently mitigated its use through responsible water usage practices and curtailment presents an unjustifiable departure from IDWR precedent.

DOE has a Federal Reserved Water Right 34-10901 (Right) for the Snake River Basin in the State of Idaho. *See* DOE Agreement at 7. The Right was adjudicated in 1990 and has a date of priority of 4/7/1950. *Id.* The purpose of use is the "primary purposes authorized by Congress" for DOE's Idaho National Laboratory (INL) Site, as well as water for fire suppression, diverted within the boundaries of the INL Site. *Id.* at 7-8. The Right is consumptive use not to exceed 35,000 acre-feet per calendar year and a maximum diversion rate not to exceed 80 cubic feet per second. *Id.* at 7. DOE reports to IDWR annually on water use and comprehensive well inventory in accordance with Article 6.2 of the Agreement.

DOE uses only a small fraction of its allocation. Annual total diversion measurements for the last fifteen years (2025 – 2010) have ranged from 6.38% to 7.95% of the allotted 35,000 acre-feet per year. The total volume of water diverted at the INL Site for 2025 was approximately 2,262 acre-feet or approximately 6.46% of the annual water right, and the maximum diversion rate was 4.19 cubic feet per second of the allotted 80 cubic feet per second. Not included in this reporting is the quantity of water recycled in accordance with permitted Idaho Department of

Environmental Quality (IDEQ) wastewater reuse facilities on the INL Site (Reuse Permits I-161-03, I-160-02, and M-130-07).

Approximately 43% of the water used at the INL is returned to the aquifer through these reuse permits. In reporting year 2025, approximately 974 acre-feet of total water diverted was returned to the aquifer. Given this, DOE consumptively used only 1,288 acre-feet of water in 2025 or approximately 3.68% of the annual consumptive water right. This water reuse is not required by the DOE Agreement, making it a significant voluntary mitigation of consumptive water use in all years.

DOE has made significant investments in water sustainability goals to reduce potable water-use intensity and to reduce non-potable freshwater consumption for industrial, landscaping, and agricultural purposes. In 2024, the INL completed a water assessment of the INL facilities. The nuclear reactor at the Advanced Test Reactor Complex (ATR) remains the major water user and was responsible for approximately 48% of the total water diverted at the INL Site. The ATR reactor uses water to flow through the heat exchanger for cooling the storage canal and for the reactor cooling tower evaporation and make-up. A key water mitigation accomplishment in 2024 was infrastructure improvements repairing leaking fixtures and equipment at the ATR Complex that will save substantial water annually. This example further demonstrates DOE's voluntary reduction in water use.

**IV. Existing Legal Agreements with the State of Idaho Require Continued Use of Water at the INL Site.**

The state of Idaho and DOE are parties to agreements including the 1995 Idaho Settlement Agreement (ISA)[3] and Supplement Agreements, 1991 Federal Facility Agreement and Consent Order (FFA/CO), the 1992 Non-Consent Order, and the Idaho National Laboratory Site Treatment Plan (STP). These negotiated settlements and regulatory compliance agreements with the State of Idaho guide the management and response obligations (such as treatment, shipment, and cleanup) of wastes at the INL Site. These agreements do not contemplate IDWR curtailment of DOE's water rights. Curtailment of DOE's federal reserved water right would halt operations and excuse DOE performance under these agreements.

**V. Physical Safety and National Security Concerns Mandate Continuity of Water Use and Operations at the INL.**

Established in 1949, INL is part of the DOE's complex of national laboratories. INL performs work in each of the strategic goal areas of the department: energy, national security, science, and environment, and is the nation's center for nuclear energy research and development. INL also performs work for the U.S. military, including the Naval Nuclear Propulsion Program. Water diverted on the INL Site is used for potable and non-potable purposes including most notably nuclear reactor cooling. Non-use of the DOE Federal Reserved Water Right at the Idaho National Laboratory Site would cause significant national security risk. Additionally, on January 20, 2025, in Executive Order 14156 the White House declared a National Energy Emergency. On May 23, 2025, the White House issued Executive Order (EO) 14301—Reforming Nuclear Reactor Testing at the Department of Energy. EO 14301 ordered

---

[3] The Naval Nuclear Propulsion Program (NNPP, also known as Naval Reactors) is also a party to the ISA in its Department of the Navy capacity. The May 14, 2026 curtailment order does not contemplate the NNPP's ISA commitments.

bringing advanced nuclear technologies into domestic production as soon as possible, and specifically named the Idaho National Laboratory for their principal responsibility for constructing and testing new reactor designs.

The single largest use of water at the INL is nuclear reactor cooling. Curtailment of the DOE Federal Reserved Water Right at the INL Site would cause significant physical safety and national security concerns. Even if IDWR were to properly join DOE to a suit to establish administration under the McCarran Amendment, application of state laws for administration would still be constrained under the Supremacy Clause by federal statutes governing safety and security procedures for federal facilities.

***i. The Naval Nuclear Propulsion Program (NNPP)***

The NNPP, a joint DOE and Department of the Navy entity also known as Naval Reactors, powers maritime dominance for the U.S. Navy and the Nation. The NNPP organic statute, at 10 U.S.C. § 6102 and 50 U.S.C. § 2511, codifying Presidential Executive Order 12344, sets forth the total responsibility of the NNPP for all aspects of the Navy's nuclear propulsion, including research, design, construction, testing, operation, maintenance, and ultimate disposition of naval nuclear propulsion plants. The Program's responsibility includes all related facilities, radiological controls, environmental safety, and health matters, as well as selection, training, and assignment of personnel. This work is accomplished by a network of dedicated research laboratories, nuclear-capable shipyards, equipment contractors and suppliers, and training facilities.

The Naval Reactors Facility (NRF), located on the INL Site, plays a vital role in supporting the nation's ability to design, build, and operate the Navy's submarines and aircraft carriers. The

NNPP's primary activities at NRF include examining, processing and preparing the Navy's spent nuclear fuel for disposal in a permanent geologic repository and conducting detailed examination of irradiated fuel, materials and test specimens to support development of new naval reactor technologies. This is the only facility where the NNPP conducts these activities. The data derived from these examinations is also used to support the current fleet of 66 submarines and 11 aircraft carriers, providing crucial data to support maximum operational capabilities.

Curtailment of the DOE Federal Reserved Water Right at the INL Site would cause physical safety and significant national security concern, including:

- Naval Reactors is a major user of the ATR. A shut down of the ATR would prevent Naval Reactors from receiving irradiation testing data, and therefore has the potential to impact operational capabilities in the active fleet and delay deployment of new technologies that are critical to maintaining the U.S. Navy's warfighting advantage.
- Among other recapitalization projects underway at NRF, a new Spent Fuel Handling Facility is being constructed with concrete as a major building material, which requires water to produce. If NRF's water usage is curtailed, construction delays are likely. Delaying construction would delay the operational capability of this facility, which is needed to support U.S. Navy aircraft carrier refueling in the 2030s. It also will delay decommissioning of the current facility which became operational in 1957, prolonging the amount of time the NNPP continues to conduct operations in a spent fuel water pool that does not meet modern design standards.
- NRF maintains a sewage lagoon, and in accordance with Idaho Administrative Code, IDAPA 58.01.16, Department of Environmental Quality Wastewater Rules, water is necessary to meet the state requirement that pond depth does not drop below two (2) feet.

Curtailment would prevent NRF from maintaining the IDEQ-approved water level in the sewage lagoon, reduce or stop its sewage treatment function, and lead to odors that could be detected by site workers under some wind conditions.

- Personnel, with daily domestic water needs, are required on site at NRF to perform labor for spent nuclear fuel management and examination duties, and emergency response. Any disruption to the availability of potable water could delay execution of work that directly supports the naval nuclear fleet and shipyards. Extended loss of potable water for domestic uses for the 1500 people on site could create personnel safety (e.g., heat stress) and sanitation concerns.

**VI. Request for Hearing**

If the Director grants DOE's petition for reconsideration by withdrawing those parts of the Final Order that curtail DOE's lawful water use, then the Director need not grant DOE's request for a hearing. However, if the Director declines to withdraw those parts from the Final Order based upon this petition, then DOE requests a hearing pursuant to Idaho Code § 42-1701A(3). DOE is an aggrieved person under the statute and has not been afforded an opportunity for a hearing on the Director's final order and is entitled to an administrative hearing on the matter pursuant to Idaho law.

**VII. Request for Stay**

DOE requests a stay of enforcement of agency action pursuant to Idaho Code § 67-5274 and rule 780 of IDWR's rules of procedure, until such time as the matter is finally resolved.

**VIII. Conclusion**

For the reasons set forth above, DOE requests that the Director withdraw those parts of the final order that curtail DOE's lawful water use and issue an amended order to that effect. If the

Director withdraws those parts of the Final Order, they need not grant DOE's request for hearing. However, if the Director declines to grant DOE's petition for reconsideration as requested above, DOE respectfully requests a hearing to address the merits of the Director's decisions and the issues raised above.

DATED this 3rd day of June 2026.

TANNER CROWTHER
Digitally signed by TANNER CROWTHER
Date: 2026.06.03 13:14:32 -06'00'

TANNER F. CROWTHER
Chief Counsel
U.S. Department of Energy
Idaho Operations Office

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of June 2026, I caused a true and correct copy of the foregoing Petition for Reconsideration and Request for Hearing to be served upon the following individuals by the designated method:

| | |
|---|---|
| Idaho Department of Water Resources<br>Director Matthew Weaver<br>P.O. Box 83720<br>Boise, ID 83720-0098<br>file@idwr.idaho.gov | [x] By Electronic Mail |
| Travis L. Thompson<br>Abby R. Bitzenburg<br>PARSONS BEHLE & LATIMER<br>PO Box 63<br>Twin Falls, ID 83303-0063<br>tthompson@parsonsbehle.com<br>abitzenburg@parsonsbehle.com | [x] By Electronic Mail |
| Norman M. Semanko<br>Garrett M. Kitamura<br>PARSONS BEHLE & LATIMER<br>800 W. Main Street, Suite 1300<br>Boise, Idaho 83702<br>nsemanko@parsonsbehle.com<br>gkitamura@parsonsbehle.com | [x] By Electronic Mail |
| Thomas J. Budge<br>RACINE OLSON<br>PO Box 1391<br>Pocatello, ID 83204-1391<br>tj@racineolson.com | [x] By Electronic Mail |
| David W. Gehlert<br>Natural Resources Section<br>U.S. DOJ, Environment and Natural Resources Div.<br>999 18th St., South Terrace, Suite 370<br>Denver, CO 80202<br>david.gehlert@usdoj.gov | [x] By Electronic Mail |
| Matt Howard<br>US Bureau of Reclamation<br>1150 N Curtis Road<br>Boise, ID 83706-1234<br>mhoward@usbr.gov | [x] By Electronic Mail |

| | |
|---|---|
| Sarah A Klahn<br>Maximilian C. Bricker<br>Somach Simmons & Dunn<br>1155 Canyon Blvd, Ste. 110<br>Boulder, CO 80302<br>sklahn@somachlaw.com<br>mbricker@somachlaw.com | [x] By Electronic Mail |
| Rich Diehl<br>City of Pocatello<br>PO Box 4169<br>Pocatello, ID 83205<br>rdiehl@pocatello.us | [x] By Electronic Mail |
| Candice McHugh<br>Chris Bromley<br>MCHUGH BROMLEY, PLLC<br>PO Box 107<br>Boise, ID 83701<br>cmchugh@mchughbromley.com<br>cbromley@mchughbromley.com | [x] By Electronic Mail |
| Robert E. Williams<br>WILLIAMS, MESERVY, & LOTHSPEICH, LLP<br>PO Box 168<br>Jerome, ID 83338<br>rewilliams@wmlattys.com | [x] By Electronic Mail |
| Robert L. Harris<br>HOLDEN, KIDWELL, HAHN & CRAPO, PLLC<br>PO Box 50130<br>Idaho Falls, ID 83405<br>rharris@holdenlegal.com | [x] By Electronic Mail |
| Zachary H. Jones<br>City Attorney, City of Idaho Falls<br>PO Box 50220<br>Idaho Falls, ID 83405<br>zjones@idahofalls.gov | [x] By Electronic Mail |
| Skyler C. Johns<br>Nathan M. Olsen<br>Steven L. Taggart<br>OLSEN TAGGART PLLC<br>PO Box 3005<br>Idaho Falls, ID 83403<br>sjohns@olsentaggart.com<br>nolsen@olsentaggart.com<br>staggart@olsentaggart.com | [x] By Electronic Mail |
| Dylan Anderson<br>DYLAN ANDERSON LAW PLLC<br>PO Box 35<br>Rexburg, Idaho 83440<br>dylan@dylanandersonlaw.com | |

Anna M. Christensen
Digitally signed by Anna M. Christensen
Date: 2026.06.03 13:19:15 -06'00'

Anna M. Christensen
Paralegal Specialist
Department of Energy Idaho Operations