RAÚL R. LABRADOR
ATTORNEY GENERAL

JOY M. VEGA, ISB No. 7887
Deputy Attorney General
Chief, Energy and Natural Resources Division

MICHAEL C. ORR, ISB No. 6720
Deputy Attorney General
Energy and Natural Resources Division
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8072
Email: joy.vega@ag.idaho.gov
michael.orr@ag.idaho.gov

*Attorneys for the State of Idaho*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STATE OF IDAHO,<br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br>Defendant. | **Case No. 1:26-cv-00546-DCN**<br><br>**MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO REMAND PURSUANT TO 28 U.S.C. § 1447(C)** |

The United States removed this case from Idaho's Snake River Basin Adjudication ("SRBA"), a comprehensive water right adjudication pending before the Twin Falls District Court of Idaho's Fifth Judicial District.[1] The United States seeks

[1] While the caption assigned to this case in this Court identifies the State as the "Plaintiff," this case was removed from the Snake River Basin Adjudication ("SRBA").

to litigate a motion for declaratory judgment that the State of Idaho ("State") originally filed in the SRBA ("*SRBA Motion*"). That motion seeks a determination that water right 34-10901, which was decreed in the SRBA in the name of the United States Department of Energy ("DOE Water Right"), is subject to priority administration by the Director of the Idaho Department of Water Resources ("IDWR") in accordance with Idaho water law.

This year the Director determined that DOE was pumping water "out of priority"—that is, taking water to which senior-priority water right holders are entitled under their rights—and thus ordered DOE to curtail its pumping or mitigate for its pumping, as required by Idaho water law. The DOE did not dispute that its pumping would deprive the holders of senior-priority rights of the water to which they were entitled, and likely would do so again in the future. Rather, the DOE asserted that sovereign immunity bars the Director from administering the DOE Water Right in accordance with Idaho law.

The United States is a party to the SRBA pursuant to the "McCarran Amendment," 43 U.S.C. § 666(a), which waives the United States' sovereign immunity in "suits" for the adjudication of water rights and, critically here, for the *administration* of those rights. The SRBA is a "suit" for *both* the adjudication and administration of water rights. Doc. 1-5 at 6. The McCarran Amendment forbids the United States from asserting sovereign immunity in SRBA proceedings and makes

---

Doc. 1. In the SRBA, the State is not the "Plaintiff" but rather the "Petitioner," and also a "Defendant." Doc. 1-1 at 67.

the United States subject to the Twin Falls District Court's decrees and orders "in the same manner and to the same extent as a private individual under like circumstances." 43 U.S.C. § 666.

Through removal, the United States seeks to circumvent this plain language, and the well-documented purpose of the McCarran Amendment, by arguing that the McCarran Amendment *exempts* the United States' water rights from priority administration under Idaho law. In other words, that DOE may take water from senior water right holders – real Idaho families, farmers, ranchers and communities – *without* being subject to priority administration "in the same manner and to the same extent as a private individual under like circumstances." *Id.*

This case must be remanded to Idaho's Twin Falls District Court for resolution in the SRBA because: (1) "prior exclusive jurisdiction" bars a federal court from exercising removal jurisdiction over the administration of water rights decreed in state court, *State Engineer of State of Nevada v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nevada*, 339 F.3d 804, 808-14 (9th Cir. 2003); and (2) removing the *SRBA Motion* from the SRBA is contrary to the McCarran Amendment's "clear federal policy" against "piecemeal" water right litigation. *Colorado River Water Cons. Dist. v. U.S.*, 424 U.S. 800, 819 (1976).[2]

---

[2] In this case, remand presents a threshold jurisdictional question and should be resolved before the Court reaches the merits of the *SRBA Motion*. *See State of Texas, v. Tubal-Cain Marine Services, Inc.,* 2025 WL 5241215, at *3 (W.D. Tex. Oct. 24, 2025) (describing remand as "a threshold issue"); *Williams v. Aetna Life Ins. Co.*, 2013 WL 593505, at *2 (S.D. Ala. Jan. 30, 2013), *report and recommendation adopted,* 2013 WL 593501 (S.D. Ala. Feb. 15, 2013 (addressing first "the threshold issue of whether this Court has jurisdiction"). The State notified this Court and the United States on

## FACTUAL AND PROCEDURAL BACKGROUND

The SRBA commenced in 1987 in the Twin Falls District Court of Idaho's Fifth Judicial District as an action for the "adjudication" of all water rights "arising under state or federal law" in Idaho's Snake River basin, "and for the administration of such rights." Doc. 1-5 at 6; *Declaration of Counsel for the State of Idaho in Support of Motion to Remand* ("*Counsel Dec.*"), Ex. 1 at 2, 13. The United States is a party to the SRBA pursuant to the McCarran Amendment. Doc. 1-5 at 7. The SRBA *Final Unified Decree* was issued in 2014, Doc. 1-5 at 1, but the Twin Falls District Court "retains jurisdiction" over the SRBA to "resolve any issues related" to administration of decreed water rights that are "not reviewable" under the Idaho Administrative Procedures Act ("IDAPA"). Doc. 1-5 at 13.

In 1990, the State and DOE signed the "Water Rights Agreement between The State of Idaho and The United States, for The United States Department of Energy" ("Agreement"), and lodged it with the Twin Falls District Court "in lieu" of requiring DOE to file a formal "notice of claim" for the DOE Water Right.[3] Doc. 1-4. The Agreement stated the parties were "unable to agree" upon whether "the issue of administration" of the DOE Water Right "is ripe or otherwise appropriate for decision in the SRBA," and "d[id] not address" this issue but rather reserved it for future litigation. Doc. 1-3 at 10. The Twin Falls District Court issued a *Partial Decree* for

---

September 14 that the State intended to seek remand, Doc. 5, yet the United States proceeded to argue the merits of the *SRBA Motion*. Doc. 6. This memorandum, however, is limited to the question of remand. The State reserves its right to file a reply in support of the *SRBA Motion*.

[3] Such "in lieu" agreements were authorized by former Idaho Code § 42-1409(3).

the DOE Water Right in the SRBA in 2003, which incorporates the Agreement by reference. Doc. 1-1 at 44.

The current dispute arose from IDWR's administration of interconnected surface and groundwater rights according to their relative priority dates. In 2005, a group of irrigation entities that divert from the Snake River (the "Surface Water Coalition" or "SWC") filed a "delivery call" under Chapter 6, Title 42 of the Idaho Code and IDWR's "Rules for Conjunctive Management of Surface and Ground Water Resources," IDAPA 37.03.11.000-.050 ("CM Rules"), seeking relief from injuries caused by junior-priority ground water rights pumping from the Eastern Snake Plain Aquifer ("ESPA"). *Declaration of Mathew Weaver, Director of the Idaho Department of Water Resources* ("*Weaver Dec.*") at 5 & Ex. 1. The delivery call proceedings have been ongoing since 2005, and the Director of IDWR annually issues orders quantifying the "material injury," if any, to the SWC's water rights due to pumping under junior-priority ground water rights. *Weaver Dec.* at 5, 7-8. When the Director determines the SWC's water rights will be materially injured by juniors' pumping, the Director issues orders requiring juniors to either curtail their pumping or provide mitigation in accordance with the CM Rules. *Id.* at 7-8.

In April 2026, the Director determined that pumping under ground water rights with priority dates junior to October 11, 1900, would materially injure the SWC's senior water rights during the 2026 water year. *Id.* at 8 & Ex. 2. Thus, and as Idaho law requires, the Director ordered those junior ground water rights curtailed unless they were covered by an approved mitigation plan. *Id.* at 8-9 & Ex. 3. The DOE

Water Right was included in the curtailment list because it has a 1950 priority date. *Id.*, Ex. 3 at 26. The Director provided a fifteen-day grace period for juniors whose rights had not previously been curtailed—including DOE—to join an existing mitigation plan. *Id*. at 4 & Ex. 3 at 26.

DOE responded by filing a "Petition for Reconsideration and Request for Hearing" with IDWR, and an amended petition a few days later. Doc. 1-7. DOE conceded the United States had been properly joined to the SRBA under the McCarran Amendment and did not dispute the validity of the *Final Unified Decree*. Doc. 1-7 at 7. DOE nonetheless asserted that IDWR's administration of decreed water rights falls outside the McCarran Amendment's waiver of sovereign immunity, and that the McCarran Amendment does not authorize "routine state curtailment or administration" of the United States' decreed water rights. Doc. 1-7 at 3. The DOE did not challenge the Director's determinations that DOE is diverting "out of priority" and injuring senior rights.

DOE's assertions led to discussions with IDWR and the Idaho Attorney General's Office regarding possible resolution of DOE's concerns. *Weaver Dec.* at 10. IDWR did not seek to enforce the curtailment order while these discussions continued. *Id.* In July, DOE informed the Idaho Attorney General's Office that DOE had "voluntarily elected" to join the Big Lost River Ground Water District for "mitigation" purposes, but "only for the 2026 water year." *Counsel Dec.,* Ex. 2. DOE emphasized, however, that it "ha[d] not withdrawn its petition" and retained "all legal rights and ability to challenge IDWR's curtailment authority in any forum." *Id*. DOE

"expressly preserve[d]" its legal positions and arguments "related to federal reserved water rights, sovereign immunity, federal preemption, and the limits of state administrative authority." *Id.*

The Director rescinded the curtailment order to the extent it applied to the DOE Water Right because DOE had joined a mitigation plan for 2026. *Weaver Dec.* at 10 & Ex. 4 at 2. The Director did not address DOE's federal law arguments because they had been reserved by the Agreement and "are more appropriately raised before the SRBA District Court." *Id.*, Ex. 4 at 2-3. In light of this, DOE's refusal to commit to mitigating for future "out of priority" diversions, and DOE's insistence that IDWR lacks authority to administer the DOE Water Right according to its decreed priority, the State filed the *SRBA Motion*. Doc. 1-1 at 7.

The *SRBA Motion* addresses the reserved "issue of administration," *id.* at 11-12, 21-36, and seeks declaratory judgment that the DOE Water Right is subject to priority administration by the Director in accordance with Idaho law, including orders requiring DOE to either curtail "out of priority" pumping or mitigate for the injuries such pumping causes to senior water rights. *Id.* at 8.

## ARGUMENT

The *SRBA Motion* should be remanded to the Twin Falls District Court because the doctrine of "prior exclusive jurisdiction" bars a federal district court from exercising removal jurisdiction over the administration of water rights decreed by a state court. *State Engineer*, 339 F.3d at 808-14. Further, DOE's attempt to pluck the *SRBA Motion* out of the SRBA contravenes the McCarran Amendment's "clear federal

policy" against "piecemeal" water rights litigation. *Colorado River*, 424 U.S. at 819.[4]

The United States' belated attempts to assert sovereign immunity from SRBA proceedings and priority administration under Idaho water law are contrary to the language and purpose of the McCarran Amendment. The United States asks this Court to interpret the McCarran Amendment so narrowly that it creates a "special federal rule defeating established state-law rules" that would result in "a legal no-man's land." *U.S. v. Idaho*, 508 U.S. 1, 7 (1993). The Supreme Court has repeatedly rejected such "technical" arguments. *Id.*

The Supreme Court has also repeatedly held that the mere existence of federal law issues in a state court proceeding under the McCarran Amendment does not override the "most important" consideration: the "clear federal policy" against "piecemeal" water rights litigation. *Colorado River*, 424 U.S. at 819. Any "collision" between state water law and federal rights and interests "can be reviewed (by the Supreme Court) after final judgment by the [state court]." *Id.* at 813.

## I. The Twin Falls District Court Has "Prior Exclusive Jurisdiction" Over the State's *SRBA Motion*.

The Ninth Circuit held in *State Engineer* that the doctrine of "prior exclusive jurisdiction" barred a federal district court from exercising removal jurisdiction over a question of water rights administration that the United States had removed from

[4] Further, the United States' notice of removal was nearly four decades too late under 28 U.S.C. § 1446(b)(3), and the United States' "manifest" intent to have its water rights decreed in the SRBA means the United States long ago waived any right of removal from SRBA proceedings. *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 649 (9th Cir. 2003).

state court under the same removal statute invoked here (28 U.S.C. § 1442(a)(1)). *State Engineer,* 339 F.3d at 807-08, 814. That doctrine applies in this case for the same reasons it applied in *State Engineer* and requires that this case be remanded to the Twin Falls District Court.

When "a court of competent jurisdiction has obtained possession, custody, or control of particular property," it has "prior exclusive jurisdiction" and "that possession may not be disturbed by any other court." *Id.* This is a "mandatory jurisdictional limitation" that applies "in the water rights context." *Id.* at 810.

The Twin Falls District Court acquired jurisdiction over "administration" of the DOE Water Right upon commencement of the SRBA,[5] Doc. 1-5 at 6, and retains jurisdiction over the disputed "issue of administration" to this day. *Id*. at 13. The *SRBA Motion* seeks to resolve the "issue of administration" that arose in SRBA proceedings on the DOE Water Right and was reserved for future litigation. Doc. 1-1 at 11-12, 20-36. The Director did not resolve this issue, *Weaver Dec.*, Ex. 4 at 2-3, thus putting it squarely within the Twin Falls District Court's retained jurisdiction under the *Final Unified Decree.* As a matter of law, therefore, the State's *SRBA Motion* must be remanded to the Twin Falls District Court.

---

[5] The SRBA is a general stream adjudication action under chpater14, title 42 of the Idaho Code, and as such is an "in rem" proceeding. *See U.S. v. Black Canyon Irrigation Dist.*, 163 Idaho 54, 61, 408 P.3d 52, 59 (2017) ("A general adjudication, like an *in rem* proceeding, is brought against property, not parties"); *Nevada v. United States*, 463 U.S. 110, 144 (1983) ("water adjudications are more in the nature of *in rem* proceedings").

## II. Removing the *SRBA Motion* From the SRBA is Contrary to the *Colorado River* Doctrine.

The Supreme Court has repeatedly held that a federal district court should decline to exercise jurisdiction over matters at issue in a general water rights adjudication pending in a state court, even when they implicate federal interests or federal law. *Colorado River*, 424 U.S. at 813-21; *Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 559-71 (1983). The Supreme Court emphasizes, rather, that "*the most important*" consideration in such cases is the McCarran Amendment, which evinces the "clear federal policy" against "piecemeal" water rights litigation. *Colorado River*, 424 U.S. at 819 (italics added); *Arizona*, 463 U.S. at 552, 569; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16 (1983) ("*By far the most important factor* in our decision to approve the dismissal [in *Colorado River*]") (italics added).

Further, "[t]he clear legislative intent behind the McCarran Amendment demonstrates" that the rationale of the *Colorado River* doctrine applies in a "case involv[ing] the *administration* of water rights." *State Engineer of Nevada v. S. Fork Band of Te-Moak Tribe of Western Shoshone Indians of Nevada*, 114 F. Supp. 2d 1046, 1052 (D. Nev. 2000) (italics added), *affirmed on different grounds*, 339 F.3d 804 (9th Cir. 2003). As the 1951 Senate Report on the McCarran Amendment explained, state officials "must apportion the water to the decreed users thereof in accordance with their decreed rights, and are required to deny the use of water to any user who at a particular time is not in the priority for the available supply of water." S.Rep.No.755, 82d Cong., 1st Sess., 5 (1951) ("Senate Report").

a. <u>All Decreed Water Rights Must Be Amenable to Administration Under Idaho Water Law.</u>

Water rights cannot be administered "piecemeal" because the "'interlocking of adjudicated water rights on any stream system'" means "'any order or action affecting one right affects all such rights.'" *Colorado River*, 424 U.S. at 810-11 (quoting the Senate Report at 4-5[6]; *see also State Engineer*, 339 F.3d at 811 ("Given the zero-sum nature of the resource, any party's unlawful diversion of water from the stream necessarily affects other users."). Thus, "'it is essential that *each and every owner* along a given water course, *including the United States*, *must be amenable to the law of the State*, *if there is to be a proper administration of the water law* as it has developed over the years." *California v. United States*, 438 U.S. 645, 678–79 (1978) (quoting the Senate Report at 6) (emphasis added). The language and legislative history of the McCarran Amendment "makes clear the legislative conclusion that the United States had to be bound by the orders of the state courts *in order to achieve effective administration of the water laws*." *State Engineer*, 114 F. Supp. 2d at 1051-52 (emphasis added).

These principles apply here because the State's *SRBA Motion* seeks to resolve a question of priority administration of the DOE Water Right with respect to "interlocking" water rights, *Colorado River*, 424 U.S. at 811, including senior-priority water rights involved in the ongoing "conjunctive administration" delivery call

[6] The Senate Report explains the congressional policy and purpose of the McCarran Amendment. Courts routinely rely upon it, often quoting it extensively. A copy of the Senate Report is attached in the Appendix.

proceedings. *Weaver Dec.* at 2-10. Conjunctive administration of junior ground water rights pumping from the ESPA relative to senior water rights diverting from the Snake River is highly complex, both factually and legally, *id.*, and priority administration of the DOE Water Right requires an understanding its impacts on senior water right holders. *See City of Pocatello v. Idaho,* 152 Idaho 830, 835, 275 P.3d 845, 850 (2012) ("Priority in time is an essential part of western water law and to diminish one's priority works an undeniable injury to that water right holder."); *Fremont-Madison Irr. Dist. & Mitigation Grp. v. Idaho Ground Water Appropriators, Inc.*, 129 Idaho 454, 461, 926 P.2d 1301, 1308 (1996) ("The issue of mitigation cannot be decided in a vacuum.").

All decreed water rights must be "amenable" to priority administration by IDWR for there to "be a proper administration of [Idaho] water law as it has developed over the years." *California* 438 U.S. at 678–79. The DOE Water Right is no exception.[7]

b. The United States' Arguments Are Contrary to the Language and Purpose of the McCarran Amendment.

The United States' invocation of sovereign immunity, Doc. 1 at 2, 6-7, simply confirms that removal is improper. The McCarran Amendment entirely waived the United States' sovereign immunity in the SRBA, and "the United States should not

[7]Federal reserved water rights such as the DOE Water Right are decreed with a priority date and quantity, Doc. 1-1 at 44, just like state water rights. *Weaver Dec.* at 2. The reason for this is to "allow[] such rights to be administered within the hierarchy of state water rights." *State of N. M. v. Comm'r of Public Lands*, 200 P.3d 86, 94 (N.M. Ct. App. 2008); *see Weaver Dec.* at 2 ("These two elements are critical in distributing water during times of shortage").

be able to accomplish indirectly, by way of removal, what it does not have the right to do directly, by asserting sovereign immunity in the state court proceeding." *State Engineer*, 114 F. Supp. 2d at 1052. Further, the Supreme Court has held—in a case arising out the SRBA—that the McCarran Amendment "submits the United States generally to state adjective law"— law "governing procedure, fees, and the like"—"as well as to state substantive law of water rights." *Idaho*, 508 U.S. at 6, 8; *accord Fed. Youth Ctr. v. Dist. Ct. In & For Jefferson Cnty.*, 575 P.2d 395, 400 (Colo. 1978) ("we construe the broad language of s 666(a)(2) to refer to the entire body of water law administration procedures of each state, regardless of the forms in which they may exist."). "Fundamental principles of federalism vest control of water rights in the states," and "[d]ecreed rights are administered under applicable state law." *U.S. v. U.S. Bd. of Water Comm'rs*, 893 F.3d 578, 595 (9th Cir. 2018).

It is undisputed that the *Final Unified Decree* is valid and the United States "is subject" to the *Final Unified Decree* "in the same manner and to the same extent as a private individual under like circumstances." 43 U.S.C. § 666(a). The *Final Unified Decree* states that decreed water rights "shall be administered" in accordance with "state law," Doc. 1-5 at 13, and under Idaho law "the director shall administer the water rights by distributing water in accordance with the final decree and with title 42, Idaho Code." Idaho Code § 42-1413(2). The McCarran Amendment thus waived any argument that the United States is not subject to priority administration under Idaho law "by reason of its sovereignty." 43 U.S.C. § 666.

The United States provides no authority for its novel view that the McCarran Amendment requires priority administration to be implemented via a "complaint" rather than a delivery call. Doc. 1 at 2. This interpretation of the McCarran Amendment creates a "special federal rule defeating established state-law rules" that would result in "a legal no-man's land," *Idaho*, 508 U.S. at 7—one of the very "evils" the McCarran Amendment was intended to eliminate. Senate Report at 5. Accepting this interpretation of the McCarran Amendment would "result in a throw-back to the conditions that brought about the enactment of the statutory water laws." *Id.* This would gravely undermine Idaho water law and frustrate the central purpose of the both the SRBA and the McCarran Amendment.

All other decreed water right holders are subject to IDWR's procedures for curtailing junior water rights in response to a delivery call. Such administration is essential to ensuring that seniors are provided timely relief and receive their water when it is needed during the present irrigation season. *See Am. Falls Reservoir Dist. No. 2 v. IDWR,* 143 Idaho 862, 874, 154 P.3d 433, 445 (2007) ("Clearly, a timely response is required when a delivery call is made and water is necessary to respond to that call."). IDWR's procedure for responding to a delivery call under the CM Rules "ensures that seniors get timely relief from out-of-priority diversions by juniors when needed." *Weaver Dec.* at 6.

This is why Idaho and most other Western states use a "two-step" system to adjudicate and administer water rights. *See State Engineer* 339 F.3d at 807 ("Like many Western states, Nevada follows a two-step process in determining and

enforcing rights to the use of water in its river systems. First is the adjudication phase.…Next comes the administration phase, where the state engineer and water commissioners give practical effect to the judicial decree and distribute water rights”). In Idaho, the Director is the state engineer, Idaho Code § 42-1701(2), and gives practical effect to the *Final Unified Decree* “by distributing water in accordance with the final decree and with title 42, Idaho Code.” *Id. §* 42-1413(2). The United States’ theory that its water rights can only be administered by an Idaho court is “unworkable” in terms of providing timely relief in response to a delivery call, and would require an “unconstitutional delegation of [executive] authority” to Idaho’s judicial branch. *In re SRBA Case No. 39576*, 128 Idaho 246, 262, 912 P.2d 614, 630 (1995).

The United States’ removal of the *SRBA Motion* from the SRBA is contrary to the McCarran Amendment’s “clear federal policy” against “piecemeal” water rights litigation. *Colorado River*, 424 U.S. at 819. This case should therefore be remanded to the Twin Falls District Court. *See generally State Engineer*, 114 F. Supp. 2d at 1048-54 (remanding under the *Colorado River* doctrine).

## III. The United States’ Removal Arguments Lack Merit.

The United States argues the *SRBA Motion* cannot be heard in the SRBA and the federal law issues the United States raises can only be heard in federal court. These arguments are meritless.

### a. The *SRBA Motion* Can Be Heard in the SRBA.

The United States asserts that SRBA Subcase 34-10901 is a “completed”

proceeding that "closed" long ago. Doc. 1 at 2. Not so. No closure order has been entered, Doc. 1-2, and the Twin Falls District Court set a briefing and hearing schedule on the *SRBA Motion* without "reopening" the subcase or even suggesting that was necessary. *Id.*; *Counsel Dec.*, Exs. 4, 5. There is also no procedural bar to filing post-decree "motions" in an SRBA subcase.[8]

The United States' assertion that the State "was never a party" to SRBA Subcase 34-10901, Doc. 1 at 2, ignores the fact that the States is a party to the Agreement, and the *Partial Decree* would not have been issued but for the Agreement. Doc. 1-4. Further, the Twin Falls District Court recognized the State as a "party" in the 2003 hearing on the court's notice of intent to issue the *Partial Decree* nunc pro tunc. *Counsel Dec.*, Ex. 8 at 3 (internal pagination p.18).[9] The State and all state agencies (except IDWR) are parties to the SRBA. Doc. 1-1 at 67; Idaho Code § 42-1401C.[10]

The SRBA is a "suit" for the administration of all decreed water rights,

---

[8] Such motions have been filed before. For instance, a "motion to enforce settlement agreement" filed in several SRBA subcases on March 27, 2024, long after the *Final Unified Decree* was issued and the subcase files had been sent to the state archives. *Counsel Dec.*, Exs. 6, 7. The SRBA is a general stream adjudication under chapter 14, title 42 of the Idaho Code over which the Twin Falls District Court has presided for nearly forty years. Any question of how SRBA procedural rules apply to the *SRBA Motion* should be left to the Twin Falls District Court.

[9] The State also has a vital interest in the DOE Water Right, and *all* water rights, because the State owns the water and must "equally guard all the various interests involved" in the use of the water. Idaho Code § 42-101.

[10] The Director is not a "party" to the SRBA but rather an "independent expert and technical assistant" who investigates water right claims and makes recommendations to the Twin Falls District Court. Idaho Code § 42-1401B.

including the DOE Water Right, Doc. 1-5 at 6, and the Twin Falls District Court retains jurisdiction over issues of administration of the decreed water rights. *Id.* at 13. The issue presented by the *SRBA Motion* is already well within the scope of the SRBA and jurisdiction of the Twin Falls District Court, and the United States cites no authority for its contention that the issue can only be resolved by filing a new "complaint." Doc. 1 at 2.

The *SRBA Motion* falls within the McCarran Amendment even under the United States' incorrect theory that priority administration can only be implemented through formal "suits." In perhaps the first case addressing the McCarran Amendment's waiver of sovereign immunity in suits for the administration of water rights, the federal district court for the District of Nevada determined that a "motion" for administration filed in the adjudication court years after the water rights had been decreed constituted a "suit" for administration. *U.S. v. Hennen*, 300 F. Supp. 256, 258-59, 261-65 (D. Nev. 1968). The same reasoning applies here.

b. <u>The Need to Consider Federal Law Does Not Justify Removal.</u>

The United States argues that allowing IDWR to administer the DOE Water Right according to state law will "paralyze" and "interfere" with INL operations. Doc. 1 at 5-6. This argument is simply an assertion that the *SRBA Motion* raises federal issues of such gravity and complexity that a state court cannot and should not be allowed to decide them. It also assumes the Twin Falls District Court will give short shrift to the United States' federal law interests and arguments and cannot be trusted

to decide them. The Supreme Court has previously rejected such arguments and this Court should reject them as well.

While state law does not control the distribution of water if there is a "preempting federal directive," *U.S. Bd. of Water Comm'rs*, 893 F.3d at 595, it does not follow that the *SRBA Motion* must be heard in a federal court. Rather, the "most important" consideration in cases such as this is the McCarran Amendment's "clear federal policy" against "piecemeal" water rights litigation. *Colorado River*, 424 U.S. at 819. This means any "collision" between federal law and the administration of decreed water rights under state law should be addressed in the first instance by state court that decreed the water rights. *Id.* The state court decision "can be reviewed," if necessary, " by the Supreme Court after final judgment by the [state court]." *Id.* at 813. (parentheses omitted; brackets added).

"State courts, as much as federal courts, have a solemn obligation to follow federal law," *Arizona*, 463 U.S. at 571, and are "competent" to apply federal law. *McKesson v. Doe*, ___ U.S. ___, 1412 S. Ct. 48, 51 (2020); *see Gila River Indian Cmty. v. Schoubroek*, 145 F.4th 1058, 1070 (9th Cir. 2025) ("we presume [state courts] to be courts of general jurisdiction until proven otherwise.").

"[A]ny state court decision alleged to abridge [reserved] water rights protected by federal law can expect to receive, if brought before [the Supreme] Court, a particularized and exacting scrutiny commensurate with the powerful federal interest in safeguarding those rights from state encroachment." *Arizona*, 463 U.S. at 571. "Mere subjection of [federal reserved] rights to legal challenge in state court

…would no more imperil those rights than would a suit brought by the Government in [federal] district court." *Colorado River*, 424 U.S. at 812; *see U.S. v. Dist. Ct. In and For Eagle County, Colo.*, 401 U.S. 520, 524 (1971) (rejecting arguments that water rights reserved under federal law should not be adjudicated in state courts).

As an Idaho district court, the Twin Falls District Court has "original jurisdiction in *all cases*." *Allen v. Campbell*, 169 Idaho 613, 618, 499 P.3d 1103, 1108 (2021) (italics in original); s*ee* IDAHO CONST. art. V, § 20 (same); Idaho Code § 1-705 (same). The Twin Falls District Court has the authority and competence to rule on any issue of federal law arising in a proceeding over which it presides, and the SRBA is no exception. *In re SRBA Case No. 39576*, 128 Idaho at 258. Nothing in Idaho or federal law limits the Twin Falls District Court's jurisdiction to resolve the federal law issues the United States seeks to raise in opposing the *SRBA Motion.*

Further, the record undermines the United States' allegations that subjecting the DOE Water Right to priority administration under Idaho water law will "paralyze" and "interfere" with INL operations. Doc. 1 at 5-6. As the State has repeatedly explained to the United States, Idaho law allows DOE to continue diverting "out of priority" pursuant to an approved mitigation plan. *In Matter of Distribution of Water to Various Water Rts. Held By or For Ben. of A & B Irrigation Dist.*, 155 Idaho 640, 653, 315 P.3d 828, 841 (2013).

That is exactly what DOE agreed to do this year, *Counsel Dec.*, Ex. 2,[11] and can easily continue to do going forward. Mitigation water supplies are available in the

---

[11] Other federal agencies also participate in mitigation plans. *Weaver Dec.* at 9-10.

upper Snake River basin, *Weaver Dec.* at 9 & n.3, and requiring DOE to participate in a mitigation plan does not "paralyze" or "interfere" with INL operations. It simply requires DOE, like any other junior ground water right holder, to remedy the injuries that its "out of priority" pumping inflicts on senior-priority surface water rights.

The issue, in short, is not whether INL will be "paralyzed." Doc. 1 at 5. It is whether the United States is accountable for depriving senior water right holders of water that they appropriated under their water rights—which are vested property rights—long before the establishment of INL.

## CONCLUSION

For the foregoing reasons, the State of Idaho respectfully requests that this Court grant the State's motion to remand, filed herewith, and remand this case to the Twin Falls District Court.

Respectfully submitted this 23rd day of September, 2026.

/s/ Michael C. Orr

Joy M. Vega
Michael C. Orr
Deputy Attorneys General
Energy and Natural Resources Division
Office of the Attorney General
State of Idaho

*Attorneys for the State of Idaho*

# APPENDIX

# Calendar No. 711

82 ... | ...NATE | { REPORT No. 755

/161

## AUTHORIZING SUITS AGAINST THE UNITED STATES TO ADJUDICATE AND ADMINISTER WATER RIGHTS

SEPTEMBER 17 (legislative day, SEPTEMBER 13), 1951.—Ordered to be printed

Mr. McCARRAN, from the Committee on the Judiciary, submitted the following

## REPORT

[To accompany S. 18]

The Committee on the Judiciary, to which was referred the bill (S. 18) to authorize suits against the United States to adjudicate and administer water rights, having considered the same, reports favorably thereon, with amendments, and recommends that the bill, as amended, do pass.

### AMENDMENTS

1. On page 1, strike out all that follows the colon in line 10 down to and including line 1, on page 2, and insert in lieu thereof the following:

*Provided*, That nothing in this Act shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream. When the United States shall be a party to any such suit it shall be deemed to have waived any right to plead that the State laws are not applicable, or that the United States is not amenable thereto, by reason of the sovereignty of the United States, and the United States shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: *Provided*,

2. At the end of the bill add the following new section:

SEC. 2. The head of every department or agency of the United States and of every corporation which is wholly owned by the United States shall, within two years from the effective date of this Act, cause to be filed with the Secretary of the Interior, in such form and detail as he shall prescribe, a complete list of all claims of right to the use by that department, agency, or corporation of the waters of any stream or other body of surface water in the United States for agricultural, silvicultural, horticultural, stock-water, municipal, domestic, industrial, mining, or military purposes, or the protection, cultivation, and propagation of fish and

wildlife, or any other purpose involving a consumptive use of water, or for the production of hydroelectric or other power or energy. Said list shall be supplemented and revised promptly as new claims of right are made and existing claims are abandoned or otherwise disposed of. A catalogue of such claims shall be maintained by the Secretary and, except for items therein which are certified by the head of the claimant department, agency, or corporation to be of such importance to the national defense as to require secrecy, shall be open to inspection by the public and, subject to the same exception, copies thereof and of items therein shall be furnished by the Secretary upon payment of the cost thereof. The Secretary may make rules and regulations to carry out the purpose of this section.

## PURPOSE

The purpose of the proposed legislation, as amended, is to permit the joinder of the United States as a party defendant in any suit for the adjudication of rights to the use of water of a river system or other source or for the administration of such rights where it appears that the United States is the owner or is in the process of acquiring water rights by appropriation under State law, by purchase, exchange, or otherwise and that the United States is a necessary party to such suit.

## STATEMENT

Hearings were held on S. 18, and the committee is of the opinion that in order to understand the background of this legislation a résumé of some of the history and decisions relating to the law of water rights would be of help.

The committee has taken note of the reports of the Department of Justice and the Department of the Interior printed below which oppose the legislation, but has concluded, after a consideration of all of the evidence available to the committee, that the legislation is meritorious.

There are two established doctrines relating to the law of water rights as it is applied in the United States today. The first is the riparian doctrine, which was inherited from England, and the second is the prior appropriation doctrine, which is founded in the customs and practices of the settlers and is uniformly recognized in the law of most of the western states.

The reason that there have been two doctrines lies in the volume of water which is available to particular sections of the country. The riparian doctrine generally has currency in localities where water is plentiful, and the prior appropriation doctrine is adhered to in those areas where water is at a premium. Under the riparian doctrine, the owner of land contiguous to a stream has certain rights in the flow of the water by reason of his ownership of land. Under the doctrine of prior appropriation the first user of the water acquires a priority right to continue the use, and the contiguity of land to the watercourse is not a factor. It can readily be seen that the western states are the ones which are susceptible to the doctrine of prior appropriation.

It will follow that the adjudication of water rights which might involve the United States would in most instances be confined to those states in which the doctrine of prior appropriation is applicable.

The doctrine of prior appropriation had its inception in the Western-States early in the settlement of the West, being brought about by the arid and semi-arid character of such States. The doctrine that "first in time is first in right" to the beneficial use of the water in the streams of such States first became the law of appropriation by custom and

was later sanctioned by constitutional and legislative enactment in 11 of the Western States. Under the law sanctioning the doctrine of "first in time is first in right," vast quantities of land in these States, beginning back in the territorial days, was brought under cultivation through the courage and hard work of those who homesteaded or otherwise secured farm and ranch lands and made appropriations of water with which to make such lands productive. Litigation with respect to the water rights developed early in the history of the right to the use of water by appropriation. Down through the years the courts of the respective States marked out the pathway whereby order was instituted in lieu of chaos. Rights were established, and all of this at the expense, trial, and labor of the pioneers of the West, without material aid from our United States Government until a much later time when irrigation projects were initiated by Congress through the Department of the Interior and later the Bureau of Reclamation. Even then Congress was most careful not to upset, in any way, the irrigation and water laws of the Western States. In 1902 Congress wrote into the Federal Reclamation Act a strict admonition to the Secretary of the Interior. Section 8 of that act, being now section 383, title 43, United States Code, is in effect as follows:

Vested rights and State laws unaffected.—Nothing in this chapter shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this chapter, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or any landowner, appropriator, or user of water in, to or from any interstate stream or the waters thereof.

It will be seen that in the Western States irrigation of the lands is essential to successful farming and ranching and failure by a landowner to receive the amount of water vested or adjudicated to him is likely to be fatal to his economic welfare.

In the arid Western States, for more than 80 years, the law has been that the water above and beneath the surface of the ground belongs to the public, and the right to the use thereof is to be acquired from the State in which it is found, which State is vested with the primary control thereof.

In 1877 the Congress, in the Desert Land Act of 1877 (19 Stat. L. 377, Ch. 107), severed the water from the land, and the effect of such statute was thereafter that the land should be patented by the United States separate and apart from the water and that all the nonnavigable water should be reserved for the use of the public under the laws of the States and Territories named in the act. This statute was construed by the Supreme Court of the United States in *California-Oregon Power Co.* v. *Beaver Portland Cement Co.* (295 U. S. 142), in which the Court, inter alia, held:

1. Following the Desert Land Act of 1877, if not before, all non-navigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated States, including those since created out of territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect to riparian rights should obtain.
2. The terms of the statute, thus construed, must be read into every patent thereafter issued, with the same force as though expressly incorporated therein, with the result that the grantee will take the legal title to the land conveyed, and such title, and only such title, to the flowing waters thereon as shall be fixed or acknowledged by the customs, laws, and judicial decisions of the State of their location.

3. The effect of the statute was to sever all waters upon the public domain, not theretofore appropriated, from the land itself, and that a patent issued thereafter for lands in a desert-land State or Territory, under any of the land laws of the United States, carried with it, of its own force, no common-law right to the water flowing through or bordering upon the lands conveyed.

In the course of its opinion the Court said:

The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public under the laws of the States and Territories named. The words that the water of all sources of water supply upon the public lands and not navigable "shall remain and be held free for the appropriation and use of the public" are not suceptible of any other construction. The only exception made is that in favor of existing rights; and the only rule spoken of is that of appropriation. It is hard to see how a more definite intention to sever the land and water could be evinced.

The Court further stated:

Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the States affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all non-navigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated States, including those since created out of the Territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common law rule in respect of riparian rights should obtain. For since Congress cannot enforce either rule upon any State, *Kansas* v. *Colorado* (206 U. S. 46, 94), the full power of choice must remain with the State.

It is interesting to note what the Court said in a marginal note on page 164 of the opinion:

In this connection it is not without significance that Congress, since the passage of the Desert Land Act, has repeatedly recognized the supremacy of State law in respect to the acquisition of water for the reclamation of public lands of the United States and lands of its Indian wards.

The effect and authority of the foregoing cited case was later followed by the Supreme Court in *Ickes* v. *Fox* (300 U. S. 82), decided February 1, 1937, wherein the Court said, at page 95.

The Federal Government, as owner of the public domain, had the power to dispose of the land and water composing it together or separately; and by the Desert Land Act of 1877 (c. 107, 19 Stat. 377), if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately. Acquisition of the Government title to a parcel of land was not to carry with it a water right; but all non-navigable waters were reserved for the use of the public under the laws of the various arid-land States. *California Power Co.* v. *Beaver Cement Co.* (295 U. S. 142, 162). And in those States, generally, including the State of Washington, it long has been established law that the right to the use of water can be acquired only by prior appropriation for a beneficial use; and that such right when thus obtained is a property right, which, when acquired for irrigation, becomes, by State law and here by express provision of the Reclamation Act as well, part and parcel of the land upon which it is applied.

It is therefore settled that in the arid Western States the law of appropriation is the law governing the right to acquire, use, administer and protect the public waters as provided in each such State.

It is most clear that where water rights have been adjudicated by a court and its final decree entered, or where such rights are in the course of adjudication by a court, the court adjudicating or having adjudicated such rights is the court possessing the jurisdiction to enter its orders and decrees with respect thereto and thereafter to enforce the same by appropriate proceedings. In the administration of and the

adjudication of water rights under State laws the State courts are vested with the jurisdiction necessary for the proper and efficient disposition thereof, and by reason of the interlocking of adjudicated rights on any stream system, any order or action affecting one right affects all such rights. Accordingly all water users on a stream, in practically every case, are interested and necessary parties to any court proceedings. It is apparent that if any water user claiming to hold such right by reason of the ownership thereof by the United States or any of its departments is permitted to claim immunity from suit in, or orders of, a State court, such claims could materially interfere with the lawful and equitable use of water for beneficial use by the other water users who are amenable to and bound by the decrees and orders of the State courts. Unless Congress has removed such immunity by statutory enactment, the bar of immunity from suit still remains and any judgment or decree of the State court is ineffective as to the water right held by the United States. Congress has not removed the bar of immunity even in its own courts in suits wherein water rights acquired under State law are drawn in question. The bill (S. 18) was introduced for the very purpose of correcting this situation and the evils growing out of such immunity.

The committee believes that such a situation cannot help but result in a chaotic condition. [Each water user under some State laws is required to pay a graduated fee or tax annually for the services of water commissioners. The commissioners must apportion the water to the decreed users thereof in accordance with their decreed rights, and are required to deny the use of water to any user who at a particular time is not in the priority for the available supply of water. Failure to comply with the lawful orders of the water commissioner subjects the offender to the administrative and penal orders of the court, usually issued in contempt proceedings. If a water user possessing a decreed water right is immune from suits and proceedings in the courts for the enforcement of valid decrees, then the years of building the water laws of the Western States in the earnest endeavor of their proponents to effect honest, fair and equitable division of the public waters will be seriously jeopardized.]

If such a condition is to continue in the future it will result in a throw-back to the conditions that brought about the enactment of the statutory water laws, i. e., the necessity that the public waters so necessary to the economic welfare of the arid States be allotted in as equitable manner as possible to all users of the available supply thereof. It is said of such laws by the Supreme Court in the case of *Pacific Live Stock Co.* v. *Oregon Water Board* (241 U. S. 447):

> * * * All claimants are required to appear and prove their claims; no one can refuse without forfeiting his claim, and all have the same relation to the proceeding. It is intended to be universal and to result in a complete ascertainment of all existing rights, to the end, first, that the waters may be distributed, under public supervision, among the lawful claimants according to their respective rights without needless waste or controversy; second, that the rights of all may be evidenced by appropriate certificates and public records, always readily accessible, and may not be dependent upon the testimony of witnesses with its recognized infirmities and uncertainties; and, third, that the amount of surplus or unclaimed water, if any, may be ascertained and rendered available to intending appropriators.

The committee is aware of the fact, as shown by the hearings, that the United States Government has acquired many lands and water rights in States that have the doctrine of prior appropriation. When

these lands and water rights were acquired from the individuals the Government obtained no better rights than had the persons from whom the rights were obtained.

Since it is clear that the States have the control of the water within their boundaries, it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the State, if there is to be a proper administration of the water law as it has developed over the years.

It will be noted that the amendment to S. 18 provides that nothing in the act shall authorize the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream. This is done in order not to open up any controversies between the States as to water rights on an interstate stream by permitting the United States to be made a party thereto.

The committee is of the opinion that there is no valid reason why the United States should not be required to join in a proceeding when it is a necessary party and to be required to abide by the decisions of the Court in the same manner as if it were a private individual.

Senator Magnuson raised the question as to whether S. 18 could be used for the purpose of delaying or blocking a multip.e-purpose development such as proposed for the Hells Canyon project on the Snake River in the Columbia Basin or other similar projects, stating that there was a possibility of an individual or group having water rights on that stream bringing suits to adjudicate their respective rights and therefore preventing the Bureau of Reclamation from going ahead with the Hells Canyon project while litigation is in process or pending. The committee, for the legislative history of this bill, definitely desires to repudiate any such intent which may be deduced from S. 18 and states that this is not the purpose and the intent of this legislation. Where reclamation projects have been authorized for the benefit of the water users and the public generally, they should proceed under the law as it exists at the present time and should the Government have reason to need the water of any particular user on a stream, that water should be obtained by condemnation proceedings as is already provided for by law. The committee can think of no particular reason why the mere development of a project should be delayed or stopped by the passage of S. 18 and it is not so intended. An exchange of letters by Senator Magnuson and Senator McCarran dealing with this feature of the bill is hereto attached and made a part of this report.

Senator Magnuson also submitted an amendment to the bill which appears as section 2 of the bill. It requires the head of each department or agency of the United States and every corporation which is wholly owned by the United States to submit within a 2-year period of time to the Secretary of the Interior a complete list of all claims of right to use any stream or body of surface water in the United States. This list shall be supplemented properly as new claims and rights are made or other claims are abandoned or otherwise disposed of. A catalog of such claims is to be maintained by the Secretary, which shall be open to the public inspection, except when they may be barred from such inspection by reason of secrecy required by national defense.

The committee is of the opinion that development of a catalog of this nature would be most salutary and that there should be a single

depository where the water rights claims of the United States should be available for whatever purpose may be needed. This provision is not only helpful to all of the landowners who may be interested in the water rights of a particular stream but is exceedingly helpful to the United States in knowing where and how it can, on short notice, determine its holdings in this respect. This is a provision the committee believes should have been in force and effect long before now and believes that it will prove most helpful in the future administration and adjudication on questions of water rights, to say nothing of the incidental uses to which such a catalog may be made.

The committee, therefore, recommends that the bill S. 18, as amended, be considered favorably.

---

DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, August 3, 1951.*

Hon. PAT McCARRAN,
*Chairman, Committee on the Judiciary,*
*United States Senate, Washington, D. C.*

MY DEAR SENATOR: The Department of Justice is unable to recommend the enactment of the bill (S. 18) to authorize suits against the United States to adjudicate and administer water rights.

This measure would permit the joinder of the United States as a defendant in any suit for the adjudication of rights to the use of water of a river system or other source or for the administration of such rights where it appears that the United States is the owner or is in the process of acquiring water rights and is a necessary party to such suit. It would also provide that the United States could effect the removal to the Federal court of any such suit in which it is a party and that no judgment for costs shall be entered against the United States in any such suit. The last provision of the bill would authorize the service of summons or other process in any such suit upon the Attorney General or his designated representative.

The general waiver of the immunity of the United States to suits involving water rights would seem objectionable. It is likely that such a general waiver would result in the piecemeal adjudication of water rights, in turn resulting in a multiplicity of actions, and the joinder of the United States in many actions in all of which it would be required to claim every right, which it could conceivably have or need, or subject itself to the possible loss of valuable rights on the theory of having split its cause of action. There is, moreover, no reason to believe that in any instance in which it is desirable to do so, Congress would fail to authorize making the United States a party defendant in the litigation of water rights.

The Director of the Bureau of the Budget has advised this office that there would be no objection to the submission of this report.

Yours sincerely,

PEYTON FORD,
*Deputy Attorney General.*

---

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington 25, D. C., August 3, 1951.*

Hon PAT McCARRAN,
*Chairman, Committee on the Judiciary,*
*United States Senate, Washington 25, D. C.*

MY DEAR SENATOR McCARRAN: Reference is made to your request of April 27 for the views of this Department on S. 18, a bill to authorize suits against the United States to adjudicate and administer water rights

I recommend that the bill be not enacted.

While there are some circumstances covered by the bill in which the relief which it would afford litigants may well be warranted, there are many others where it is more fitting that litigants be required to pursue their remedies under the Tort Claims Act or the Tucker Act.

The interests of the United States in the use of the waters of its river systems are so many and so varied that a full enumeration of them could not be made without a great deal of careful study. It is enough, I hope, for present purposes to exemplify these interestes by pointing to those which it has under the commerce clauses of the Constitution; those which exist by virtue of the creation of Indian reservations under the doctrine of *United States* v. *Winters* (207 U. S. 564 (1908)) or by virtue of the creation of, for instance, a national park; those which it has asserted by entering into international treaties; those which it may have by virtue of its present and prior ownership of the public domain and which have not vested under the acts of July 26, 1866 (14 Stat. 253, 43 U. S. C. 661), July 9, 1870 (16 Stat 218, 43 U. S. C. 661), and March 3, 1877 (19 Stat. 377, 43 U. S. C. 321); those with respect to which its officers and employees have followed the procedure prescribed in section 8 of the act of June 17, 1902 (32 Stat. 388, 43 U. S. C. 383); and those which it has acquired by purchase, gift, or condemnation from private owners. Since the United States can be said, with varying degrees of accuracy, to be the "owner" of rights of any or all these types, it is clear to me that enactment of the bill could lead to a tremendous volume of unwarranted litigation and, in the absence of a complete and detailed catalogue of all the rights and interests which the United States has in the stream systems of the Nation, to the hazard that, by overlooking some, it would be forever precluded from asserting them thereafter.

The brief exemplification of some of the types of interests given above does, however, suggest an approach to the problem which, we believe, merits consideration. Subject to the qualifications noted in the next paragraph, it seems to me to be proper for the United States to permit itself to be joined as a party defendant, with a right of removal (as is now provided in the bill) to the Federal district court, wherever,

(1) in the course of a judicial proceeding in a State court for a general adjudication of rights to the consumptive use of waters within that State it is made to appear to the court that the United States is a claimant of such right and is a necessary party to the proceeding; that the right is claimed for the direct benefit of persons who, if they were themselves the claimants, would be subject to the laws of that State with respect to the appropriation, use, or distribution of water; and that the right claimed by the United States exists solely by virtue of the laws of the State and is required, by a statute of the United States, to be established by an officer or employee thereof in accordance with said laws or has been or is being acquired by the United States from a predecessor in interest whose right depends upon its having been so established; or

(2) judicial review is sought, as provided by State law, by a person adversely affected by and a party to a State administrative proceeding relating to the appropriation, use, or distribution of water invoked by a duly authorized officer or employee of the United States upon the outcome of which a right of the United States depends.

The qualifications spoken of above which should, I believe, be attached to such a waiver of immunity are these: (a) The waiver should in all instances be limited to an adjudication of those rights of the United States which depend solely upon their having been acquired pursuant to State law and should not extend to those that exist independently of such law or to those which have existed for a stated number of years (say, 6 years); (b) it should be limited to those claims which are made to appear with particularity in the papers upon the basis of which the court is moved to make the United States a party; (c) it should not extend to the granting of equitable relief against the United States or to the entering of a judgment for costs against it; (d) the United States should not in any way be prejudiced in the adjudication by the existence of a prior decree granted in any adjudication to which it was not lawfully made a party; (e) the waiver should not extend to rights asserted by the United States for or on behalf of Indians.

The Bureau of the Budget has advised that there is no objection to the submission of this report to your committee.

Sincerely yours,

MASTIN G. WHITE,
*Acting Assistant Secretary of the Interior.*

AUGUST 24, 1951.

Re S. 18.
Hon. PAT McCARRAN,
*Chairman, Committee on the Judiciary,*
*United States Senate.*

DEAR SENATOR: I am in agreement with the general purposes of S. 18. However, there is one possible implication in the bill that has caused me some apprehension and I take this means of achieving clarification before final action by our committee occurs.

It appears to me that section 1 of the bill—although I am sure that is not the intent—might make it possible to block or delay a multiple-purpose development, such as proposed for the Hells Canyon project on the Snake River in the Columbia Basin.

I visualize the possibility of an individual or group, having water rights on that stream, bringing suit to adjudicate their respective rights—thereby preventing the Bureau of Reclamation from going ahead with the Hells Canyon project while litigation is in process or pending. Such action on the part of appropriators might be taken on their own initiative or might be stimulated by third parties who have been opposing this development.

A similar set of circumstances might prevail with respect to other streams in the Basin. I will appreciate the benefit of your best judgment as to whether S. 18 could be used in the manner I have described. I think clarification on this point will be extremely useful if made a part of the legislative history of this bill.

I have another suggestion I respectfully submit for consideration of the committee. From all I can gather, there is no central place in the entire administrative branch of the Government where a catalog of water rights, to which the several agencies lay claim, has been assembled or is maintained. It appears to me it would be extremely helpful to the Attorney General to have access to an up-to-date list of the water rights he may be called upon to protect.

Accordingly, I am attaching a suggested new section for the bill and commend it to you for consideration before final action on S. 18 is taken.

Kindest personal regards.

Sincerely,

WARREN G. MAGNUSON, U. S. S.

---

AUGUST 25, 1951.

Hon. WARREN G. MAGNUSON,
*United States Senate, Washington, D. C.*

MY DEAR SENATOR MAGNUSON: I was very pleased to receive your letter of August 24, 1951, relative to S. 18, which provides for the joining of the United States in suits involving water rights where the United States has acquired or is in the process of acquiring water rights on a stream and is a necessary party to the suit.

I note that you raise the question that it might be possible to block or delay a multiple-purpose development, such as proposed for the Hells Canyon project on the Snake River in the Columbia Basin. You indicate that you visualize the possibility of an individual or group, having water rights on that stream, bringing suit to adjudicate their respective rights thereby preventing the Bureau of Reclamation from going ahead with the Hells Canyon project while litigation is in process or pending.

S. 18 is not intended to be used for the purpose of obstructing the project of which you speak or any similar project and it is not intended to be used for any other purpose than to allow the United States to be joined in a suit wherein it is necessary to adjudicate all of the rights of various owners on a given stream. This is so because unless all of the parties owning or in the process of acquiring water rights on a particular stream can be joined as parties defendant, any subsequent decree would be of little value. I agree with you that for purposes of legislative history, the report should show that S. 18 is not intended to be used for the purpose of obstructing or delaying Bureau of Reclamation projects for the good of the public and water users by the method of which you speak and in that connection I propose that such a statement be incorporated in the report and that this exchange of letters be attached thereto.

You further suggest an amendment to the bill relative to the cataloging of water rights to which the several agencies of the Government lay claim and with this suggestion I am heartily in accord. I believe that such an amendment should be presented to the committee for its incorporation into S. 18.

I trust that the foregoing has served to clarify the situation as to your doubts. Kindest personal regards.

Sincerely,

PAT MCCARRAN, *Chairman.*

O